**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ENVIRONMENTAL JUSTICE HEALTH ALLIANCE FOR CHEMICAL POLICY REFORM; CLEAN WATER ACTION; NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW R. WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  19-cv-2516 <br> ECF Case |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. Across the United States, massive storage tanks filled with hazardous substances line rivers and lakes and nestle in floodplains. These tanks contain chemicals that, if spilled, can cause serious harm to human health and the environment.

2. These risks are not hypothetical. Facilities that make, use, or store hazardous substances report thousands of spills each year. Hundreds of those spills reach water, including drinking water sources.

3. During Hurricane Harvey, which devastated the Houston, Texas area in 2017, tens of thousands of pounds of harmful chemicals, including benzene, butadiene, and other human carcinogens were released in spills, explosions, fires, and catastrophic failures. These chemicals

1

mixed into floodwaters that inundated homes, schools, and businesses. Numerous emergency responders were hospitalized for exposure to these chemicals.

4. When Hurricane Harvey hit, there were no state or federal regulations requiring that Houston's chemical facilities plan to prevent and respond to these types of disastrous spills.

5. Congress recognized the need for this type of regulation decades ago. In 1990, Congress amended the Clean Water Act to mandate federal regulations that would require the most dangerous chemical facilities to develop plans to prevent, mitigate, and respond to worst-case spills of hazardous substances, including spills during adverse weather.

6. The U.S. Environmental Protection Agency (EPA) was required to issue these regulations by August 1992. More than a quarter century later, EPA still has not done so.

7. EPA's failure to comply with its non-discretionary duty to issue worst-case spill regulations violates the Clean Water Act and leaves the environment and the public, especially the communities closest to chemical facilities and the workers in those facilities, at a greater risk of harm from chemical spills.

8. Plaintiffs ask the Court to require EPA to do what Congress mandated in 1990: issue regulations that require the most dangerous chemical facilities to develop plans to prevent, mitigate, and respond to worst-case spills of hazardous substances.

THE PARTIES

**The Plaintiffs**

9. Plaintiff Environmental Justice Health Alliance for Chemical Policy Reform (EJHA) is a national collective of approximately thirty community-based environmental justice organizations located in more than a dozen states. EJHA and its member organizations work to hold the chemical industry accountable for the disproportionate burdens and harms it places on

communities living on the fenceline of chemical facilities—communities that are predominantly made up of low-income people, people of color, and native indigenous groups. EJHA uses intergenerational organizing strategies to transform its members' neighborhoods into healthy, sustainable, and just communities for children, youth, adults, elders, and their families. EJHA also uses publicly available information to educate fenceline communities about risks from nearby chemical facilities and to support its advocacy for stronger protections against chemical disasters at the local, state, and national levels.

10.     EJHA brings this action on its own behalf. EJHA uses information that EPA and other federal agencies collect from chemical facilities to educate the public, their partners, and government officials about the risks those facilities pose to surrounding communities. EJHA would use the information Congress required in worst-case spill plans, including the facility-specific procedures in place to prevent, mitigate, and respond to worst-case spills of hazardous substances, to further its public education and advocacy work. That information would be available to the public, including EJHA, once facilities submitted their worst-case spill plans to EPA. EPA's failure to issue worst-case spill regulations prevents EJHA from accessing the information required in worst-case spill plans. This denial of congressionally mandated information hinders EJHA's public education and advocacy work. EJHA therefore has been and continues to be injured by EPA's failure to issue worst-case spill regulations.

11.     EJHA also brings this action on behalf of its member organizations. EJHA's member organizations represent communities in areas with dense concentrations of aboveground storage tanks and chemical facilities that make, use, or store hazardous substances. These organizations' members are fearful that spills from those facilities will harm their families' health by polluting the air and contaminating surrounding ground, surface, and drinking waters

that they use and enjoy. EPA's failure to issue worst-case spill regulations increases the risk of harmful spills from these facilities. EPA's failure also prevents EJHA's member organizations from accessing information required in worst-case spill plans, hindering those organizations' public education and advocacy work. EJHA's member organizations and the people and communities these organizations represent therefore have been and continue to be injured by EPA's failure to issue worst-case spill regulations.

12. Plaintiff Clean Water Action is a national, not-for-profit environmental membership organization with more than 650,000 members nationwide. Clean Water Action's mission includes prevention of pollution in the nation's water, protection of natural resources, creation of environmentally safe jobs and businesses, and empowerment of people to make democracy work. Its activities include policy research and advocacy, public education, and grassroots mobilization. Clean Water Action was involved with the passage of the Clean Water Act in 1972. Since its founding, Clean Water Action's core programs have included efforts to strengthen the Clean Water Act's implementation and enforcement, work toward the Act's goal of zero discharge of pollution into the waters of the United States, and protect drinking water sources from contamination.

13. Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a national, not-for-profit environmental and public health membership organization with more than 380,000 members nationwide. NRDC engages in research, advocacy, media, public education, and litigation related to protecting public health and the environment. NRDC litigates to implement and enforce the Clean Water Act, and fights to protect and secure clean, safe drinking water for communities across the country.

14. Clean Water Action and NRDC bring this action on behalf of their members. Clean Water Action's and NRDC's members live in areas with dense concentrations of aboveground storage tanks and chemical facilities that make, use, or store hazardous substances. These members are fearful that spills from those facilities will harm their health and the environment by polluting the air and contaminating surrounding ground, surface, and drinking waters that they use and enjoy. These members' concerns about pollution from chemical spills also diminish their use and enjoyment of nearby waters for recreation. EPA's failure to issue worst-case spill regulations increases the risk of harmful spills. Clean Water Action's and NRDC's members therefore have been and continue to be injured by EPA's failure to issue worst-case spill regulations.

**The Defendants**

15. Defendant EPA is an agency of the U.S. government. EPA is responsible for administering the provision of the Clean Water Act at issue in this case.

16. Defendant Andrew R. Wheeler, EPA Administrator, is the highest ranking official at EPA. Administrator Wheeler is responsible for issuing the worst-case spill regulations at issue in this case. Plaintiffs sue Administrator Wheeler in his official capacity.

**JURISDICTION AND VENUE**

17. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1361, 33 U.S.C. § 1365(a)(2), and 5 U.S.C. §§ 702, 706(1).

18. This Court has authority to issue declaratory relief under 28 U.S.C. §§ 2201(a), 2202.

19. This Court has authority to order injunctive relief under 33 U.S.C. § 1365(a) and 5 U.S.C. § 706(1).

20. Venue is proper in this district because this action is brought against an agency of the United States and an officer of the United States acting in his official capacity, Plaintiff NRDC resides in the Southern District of New York, and no real property is involved in this action. *See* 28 U.S.C. § 1391(e)(1).

21. Plaintiffs have provided EPA with at least sixty days' written notice of the violations of law alleged herein in the form and manner required by the Clean Water Act. 33 U.S.C. § 1365(b)(2); 40 C.F.R. § 135.3(b). A copy of Plaintiffs' notice letter is attached to this complaint.

## STATUTORY AND REGULATORY FRAMEWORK

22. Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Through the Act, Congress intended that "the discharge of pollutants into the navigable waters be eliminated." *Id.* § 1251(a)(1).

23. As part of the Oil Pollution Act of 1990, Congress amended the Clean Water Act to specifically address the worst chemical spills at the most dangerous industrial facilities. In those amendments, Congress mandated that the "President shall issue regulations which require an owner or operator" of certain industrial facilities "to prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of . . . a hazardous substance" (hereinafter "worst-case spill regulations"). Pub. L. No. 101-380, § 4202(a)(6), 104 Stat. 484, 529-30 (Aug. 18, 1990) (codified at 33 U.S.C. § 1321(j)(5)(A)(i)).

24. A worst-case discharge is "the largest foreseeable discharge in adverse weather conditions," including a discharge "resulting from fire or explosion." *Id.* §§ 4201(b), 4202(a)(6), 104 Stat. at 527, 530 (codified at 33 U.S.C. § 1321(a)(24)(B), (j)(5)(D)(iii)).

25. Congress required that the worst-case spill regulations cover, among other facilities, any "onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters, adjoining shorelines, or the exclusive economic zone" (hereinafter "substantial-harm facilities"). *Id.* § 4202(a)(6), 104 Stat. at 530 (codified at 33 U.S.C. § 1321(j)(5)(C)(iv)).

26. The plans required by the worst-case spill regulations must, *inter alia*, describe the training, equipment testing, drills, and response actions needed to prevent and mitigate worst-case spills; identify and ensure the availability of personnel and equipment needed to respond to, prevent, and mitigate worst-case spills; and identify the qualified individual with authority to implement a cleanup and require that person to communicate immediately with federal officials. *Id.* (codified at 33 U.S.C. § 1321(j)(5)(D)).

27. Congress mandated that "the President shall issue" the worst-case spill regulations "[n]ot later than 24 months after the date of enactment" of the Oil Pollution Act. *Id.* § 4202(b)(4)(A), 104 Stat. at 532. The Oil Pollution Act was enacted on August 18, 1990. *Id.* 104 Stat. at 484.

28. The deadline for the worst-case spill regulations was August 18, 1992.

29. President George H.W. Bush delegated the President's responsibilities to issue worst-case spill regulations for non-transportation-related facilities to the EPA Administrator in October 1991. Exec. Order No. 12,777 § 2(d)(1), 56 Fed. Reg. 54,757, 54,761 (Oct. 18, 1991). Non-transportation-related facilities are facilities that make, use, or store—rather than

transport—hazardous substances, such as aboveground storage tanks and chemical manufacturing and processing plants.

30.     The EPA Administrator therefore had a non-discretionary duty to issue worst-case spill regulations for non-transportation-related substantial-harm facilities by August 18, 1992.

31.     Under the Clean Water Act, "any citizen may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). "The district courts shall have jurisdiction . . . to order the Administrator to perform such act or duty . . . ." *Id.* § 1365(a).

32.     The Administrative Procedure Act entitles a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action"— including the failure to act—to seek "judicial review thereof." 5 U.S.C. § 702; *see id.* § 551(13). "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTS

33.     EPA was required to issue worse-case spill regulations for non-transportation-related substantial-harm facilities that make, use, or store hazardous substances by August 18, 1992.

34.     EPA did not meet that deadline. Over twenty-six years later, EPA still has not met its non-discretionary duty to issue these regulations.

35.     As a result, there is currently no federal requirement that non-transportation-related substantial-harm facilities plan to prevent and respond to worst-case spills of hazardous substances. EPA's decades-long failure to regulate allows the country's most dangerous

chemical facilities to decide for themselves whether to plan to prevent and respond to catastrophic spills, including spills during adverse weather. This regulatory vacuum has grave environmental, public health, and social-justice consequences.

36.     According to an EPA analysis of data collected by the U.S. Coast Guard National Response Center, from 2007 to 2016, there were more than 9,000 spills of chemicals listed as hazardous substances under the Clean Water Act. Of these spills, nearly 2,500 originated from non-transportation-related facilities and reached water, where, by definition, they "present[ed] an imminent and substantial danger to the public health or welfare." 33 U.S.C. § 1321(b)(2)(A).

37.     Because National Response Center spill data are based on chemical facilities' initial self-reporting, the data likely greatly underrepresent actual hazardous-substance spills and those spills' impacts on public health and the environment.

38.     Recent hazardous-substance spills during adverse weather demonstrate the need for worst-case spill regulations:

   a. In August 2017, during flooding from Hurricane Harvey, a damaged valve on an aboveground storage tank at the Chevron Phillips chemical plant in Baytown, Texas spilled 34,000 pounds of sodium hydroxide (lye), a caustic substance that can cause severe burns, and 300 pounds of benzene, a known human carcinogen. Most of the chemicals were lost in the floodwater. This was just one of the more than 100 toxic chemical releases during Hurricane Harvey.

   b. In May 2017, during record rainfalls, Sabic Innovative Plastics in Burkville, Alabama released approximately 4,500 pounds of sodium hydroxide into a nearby tributary. That same facility also flooded in 2011, releasing 125

        gallons of tetrachloroethylene, a probable human carcinogen that may harm the nervous system, liver, kidneys, and reproductive system, and may be harmful to fetuses.

    c.    In June 2015, heavy rains inundated the Toledo Refining facility near the Maumee River, in Toledo, Ohio, causing the facility's treatment ponds to spill several million gallons of wastewater containing benzene.

    d.    In September 2014, during heavy rainfall, a DuPont cyanide plant in Memphis, Tennessee spilled ten pounds of hydrogen cyanide and sodium cyanide that reached water. Both chemicals are potent toxins, exposure to which can cause severe harm to the nervous, cardiovascular, and respiratory systems. In July 2013, during flash flooding, the same facility spilled forty pounds of hydrogen cyanide into the Loosahatchie River, which feeds the Mississippi River.

39.    Hazardous-substance spills like those described above pose a disproportionate threat to low-income communities and communities of color. Previous analyses of National Response Center data show that for the contiguous United States as a whole, the incidence of hazardous-substance spills increases as the share of population that is non-white increases.

40.    Each of the spills listed in Paragraph 38 reflect this disproportionate burden. The population of Baytown, Texas is nearly half Hispanic or Latino. Lowndes County, which contains Burkville, Alabama, is three-quarters Black. The population of Toledo, Ohio is more than one-quarter Black. And Memphis, Tennessee is more than half Black. In each of these communities, around one-quarter of the population lives below the poverty line.

41. Climate change, by causing sea-level rise and increasing the frequency and severity of weather disasters, is increasing the risk of environmental and public-health harms from chemical spills. As this complaint is being filed, Nebraska, Iowa, and several other states are experiencing devastating and historic flooding. In 2018, Hurricane Florence set dozens of flood records in North Carolina, breaking those established only two years earlier by Hurricane Matthew. Houston, Texas experienced three "500-year floods" in three years, culminating with Hurricane Harvey in August 2017. In 2016, a "1,000-year rain event" caused unprecedented flooding in parts of southern Louisiana. The need for regulations to protect communities from the risk of chemical spills during severe weather has only increased since Congress mandated worst-case spill regulations in 1990.

42. EPA's longstanding failure to issue worst-case spill regulations for non-transportation-related substantial-harm facilities endangers the environment and human health, particularly for fenceline communities that are predominantly made up of low-income people and people of color.

43. Plaintiffs therefore seek a declaration that EPA has failed to perform its non-discretionary duty to promulgate these worst-case spill regulations, and an injunction setting an expeditious, enforceable schedule for EPA to initiate and complete a rulemaking.

## CLAIMS FOR RELIEF

### COUNT ONE

44. Plaintiffs incorporate by reference all preceding paragraphs.

45. EPA has failed to issue regulations mandated by the Clean Water Act requiring non-transportation-related substantial-harm facilities to plan to prevent, mitigate, and respond to worst-case spills of hazardous substances. *See* 33 U.S.C. § 1321(j)(5)(A)(i).

46. EPA's failure to issue these regulations constitutes a failure to perform a non-discretionary act or duty in violation of the Clean Water Act. *See* 33 U.S.C. § 1365(a)(2).

## COUNT TWO

47. Plaintiffs incorporate by reference all preceding paragraphs.

48. EPA has failed to issue regulations mandated by the Clean Water Act requiring non-transportation-related substantial-harm facilities to plan to prevent, mitigate, and respond to worst-case spills of hazardous substances. *See* 33 U.S.C. § 1321(j)(5)(A)(i).

49. In the alternative to Count One, EPA's failure to issue these regulations constitutes agency action unlawfully withheld contrary to and in violation of the Administrative Procedure Act, *see* 5 U.S.C. § 706(1), and the Clean Water Act, *see* 33 U.S.C. § 1321(j)(5)(A)(i).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment against EPA:

A. Declaring that EPA's failure to issue regulations under 33 U.S.C. § 1321(j)(5)(A)(i) requiring non-transportation-related substantial-harm facilities to plan to prevent, mitigate, and respond to worst-case spills of hazardous substances violates a non-discretionary duty under the Clean Water Act, 33 U.S.C. § 1365(a)(2), or represents agency action unlawfully withheld in violation of the Administrative Procedure Act, 5 U.S.C. § 706(1);

B. Compelling EPA to promptly initiate rulemaking and issue worst-case spill regulations requiring non-transportation-related substantial-harm facilities to plan to prevent, mitigate, and respond to worst-case spills of hazardous substances, as required under 33 U.S.C. § 1321(j)(5)(A)(i), by Court-imposed deadlines;

C. Awarding Plaintiffs their reasonable attorneys' fees and costs; and

D. Granting such further relief as the Court deems just and proper.

Dated: March 21, 2019					Respectfully submitted,

						_____
						Kaitlin A. Morrison (KM 5120)
						Sara E. Imperiale (SI 4562)
						Natural Resources Defense Council
						40 West 20th Street
						New York, NY 10011
						T: (212) 727-4532
						F: (212) 727-1773
						kmorrison@nrdc.org
						simperiale@nrdc.org

						Dimple Chaudhary (DC 5349)
						Natural Resources Defense Council
						1152 15th Street NW, Suite 300
						Washington, DC 20005
						T: (202) 289-2385
						F: (415) 795-4799
						dchaudhary@nrdc.org

						Counsel for Plaintiffs